### In re MACON SASH, DOOR & LUMBER CO.

(District Court, S. D. Georgia, W. D. December 6, 1901.)

1. CREDITORS' BILL—INSOLVENCY PROCEEDING.
   A proceeding in the form of a creditors' bill, filed in a court of that state, under sections 2716–2722, inclusive, of the Code of Georgia, with the averments and prayers essential under those sections, is an insolvency or state bankruptcy proceeding.

2. SAME.
   Ryan v. Kingsberry, 14 S. E. 605, 88 Ga. 389, and Comer v. Coates, 69 Ga. 495, cited and approved.

3. BANKRUPTCY—PREFERENCES.
   The character of a proceeding in court may be tested by what can be accomplished under it, and since the bankruptcy act of 1898 has been in operation it is incompetent for a lien creditor of a bankrupt to so use his lien in the state court as to support a state insolvency proceeding, and distribute the assets of the bankrupt according to the priorities and preferences fixed by the state law, and thus supplant and nullify the uniform system provided by the national bankruptcy act.

4. SAME—CONTEMPT.
   When a custodian, who has no personal interest, after full hearing by the bankruptcy court, refuses to surrender any of the assets of a bankrupt to the marshal when so ordered, upon the pretense he has a right to hold a part, he is not entitled to discharge from contempt proceedings, even on habeas corpus, until he surrenders that to which he has no claim. Tinsley v. Anderson, 18 Sup. Ct. 805, 171 U. S. 101, 43 L. Ed. 41, cited.

5. SAME—SUSPENSION OF STATE LAWS.
   The bankruptcy or insolvency laws of a state are suspended by the enactment of a uniform system of bankruptcy, and proceedings under such insolvency laws, commenced after the passage of the bankruptcy act, are ipso facto null and void, and the appointment of a receiver by a state court to administer the assets under such insolvency proceedings is a nullity, and may be so held in any court when it becomes material to the interest of parties to consider it.

6. JURISDICTION—COMITY.
    Comity cannot confer jurisdiction, and its exercise cannot impart validity to orders and decrees which are in themselves null and void.

(Syllabus by the Court.)

John R. L. Smith, for petitioning creditors.
Dessau, Harris & Harris, for T. J. Carling.

SPEER, District Judge. The argument in this cause has taken a very wide range, and has been accorded the attention properly due to the importance of the controversy, and the professional accomplishments of the learned counsel who have favored the court by the exercise of their industry and acumen. The issue, however, to be determined is by no means so comprehensive. Indeed, it seems to possess little difficulty, when considered in the broad light afforded by the clear enactments of congress and of the general assembly of Georgia, and by the authoritative decisions of the national courts in expounding the statutes of the United States, and of the state courts in expounding the laws of the state.

The Macon Sash, Door & Lumber Company is an insolvent corporation, and was engaged in the business of manufacturing. Having committed acts of bankruptcy, certain creditors, among them the Seymour Lumber Company, the Bank of Vienna, and the Citizens' Bank of Cordele, instituted proceedings in involuntary bankruptcy. These proceedings were for a time resisted by the defendant corporation, but finally the attorneys for the bankrupt company withdrew its answer, and the adjudication of the bankrupt immediately followed. The assets of the bankrupt corporation are of large value. They are not, however, at this time in the possession of any officer of the bankrupt court, but are found to be in the custody and control of T. J. Carling. The control of these assets by Mr. Carling not being satisfactory to the creditors of the Macon Sash, Door & Lumber Company, who instituted the proceedings in bankruptcy, they have brought their petition conformably to clause 3 of section 2 of the bankruptcy act of 1898, and have obtained an order that the marshal of this district take possession of the assets for their preservation. The order was granted, and application made to Carling to turn over the values of the bankrupt company in his hands. This he declined to do, and in brief informed the marshal that he held these assets as the receiver of the honorable the superior court of Bibb county, and that he was directed by that honorable court to appear before this court, and make respectful answer, and show cause why he ought not to be required to turn over the assets in question, as had been demanded of him. This action on the part of Mr. Carling having been reported to the court, he was, upon appropriate petition and by appropriate order, afforded the opportunity to conform to the instructions of the honorable superior court, and show cause here as aforesaid, and, in case of his failure to do so, also to show cause why attachment should not be issued against him for refusing to surrender the property of the bankrupt.

The cause shown by the respondent consists of a certified copy of a proceeding in the superior court of Bibb county, with various decrees and orders therein passed by the Honorable William H. Felton, judge of the superior court, which proceeding was brought by the Exchange Bank of Macon against the Macon Sash, Door & Lumber Company, as an insolvent corporation. This bill was filed long after the passage of the bankruptcy enactment of 1898. It is an attempt to utilize, for the distribution of the assets of the insolvent corporation, the state bankruptcy system, which was enacted in 1880 and 1881, and has been from time to time amended since then. This may be found in Code Ga. (§§ 2716–2722, inclusive). This act provides:

"In case any corporation not municipal, or any trader, or firm of traders, shall fail to pay, at maturity, any one or more matured debts, payment of which has been properly demanded of such debtor, and by him refused, and shall be insolvent, it shall be in the power of a court of equity, under a creditors' petition, to which one or more creditors, representing one third in amount of the unsecured debt of such insolvent corporation, trader, or firm of traders, whose debts are matured and unpaid, shall be necessary parties, to proceed to collect the assets, real and personal, including choses in action and money, and appropriate the same to the creditors of such trader, firm of traders or corporation."

By section 2717 it bestows equity powers upon the chancellor. By section 2718 it defines who may be parties. In subsequent sections it provides for the method of distribution of assets. It makes allowance for the defendants' support pending the proceedings, defines the insolvents who shall be affected by the act, among them corporations and manufacturers manufacturing articles to the extent of $5,000 per annum, and in the concluding paragraph (2722) it declares it shall be in the power of the chancellor in his final judgment in the cause to express the opinion, if the facts authorize it, that from the facts as they have transpired during the progress of the cause the defendant has entirely and fairly delivered up his assets for distribution under the law, and to recommend to the creditors of the defendant that they release him from further liability. The title of this chapter of the Code is "Insolvent Traders." It is the insolvency law which has been provided for persons of this class by the general assembly of the state. It is upon this bill in the superior court, based upon this insolvency law of the state, that the respondent relies as cause why he should not be ordered to surrender assets of the bankrupt corporation to the proper officer designated conformably to law by the bankruptcy court.

It is, however, insisted with much earnestness by the learned counsel for the respondent that this insolvency system of the state was not in its nature an insolvency or bankruptcy act, and therefore not analogous to a bankruptcy proceeding, which will be under the uniform authorities suspended and superseded by the national bankruptcy law. This proposition would be of the utmost importance if it could be accepted as true. Unfortunately, however, for the learned counsel who propound it, the supreme court of the state, in construing this very enactment, has made more than one deliverance which settles its character, and which is altogether in

conflict with this contention. In the case of Ryan v. Kingsberry, 88 Ga. 389, 14 S. E. 605, that accomplished jurist, Justice Samuel Lumpkin, in rendering the opinion of the court, declares:

"In the case of Comer v. Coates, 69 Ga. 495, Chief Justice Jackson quite aptly refers to the insolvent traders' act as putting a trader in bankruptcy and relieving him from past debts as far as state legislation can do so."

This expression of Chief Justice Jackson is quoted with approval, Justice Lumpkin remarking: "The act does in many respects resemble the bankruptcy acts of congress."

When we refer to Comer v. Coates, supra, we find an extensive discussion of this act, and an authoritative construction, which, it is superfluous to say, is binding upon the courts of the United States. Quoting the first section, Chief Justice Jackson, on page 493, 69 Ga., remarked:

"The first section seems to contemplate the trader engaged in his avocation or trade at the time the creditor would bring him into a sort of bankrupt court, shut up his business, and administer his assets."

It will be observed that this applies as well to an insolvent corporation, not municipal, as to a trader. After completing his recitals from the statute, the learned chief justice continues:

"So that the scheme of the act evidently is to make persons, natural or artificial, who are engaged in business of certain kinds, pay their debts at maturity on demand, or on failure thereof, if insolvent, to close up that business, and stop further imposition on the community. A penalty is put upon them if they fail to pay until they become insolvent. That penalty is that equity will seize their effects and administer their property while in life. If they have already ceased to transact business, then the penalty is paid already, and the act becomes inoperative."

And, concluding this line of reasoning, he adopts the construction quoted by Justice Lumpkin, above:

"It is putting a trader in bankruptcy, and relieving him from past debts, as far as state legislation can do."

It is to be observed that this proceeding by the creditors may be instituted upon a simple contract debt. No lien is necessary, judgment or otherwise; no return of nulla bona, as usual with creditors' bills, is essential. It is not a remedy which would have any standing in a court governed by the doctrines of general equity jurisprudence.

An analysis of the provisions of the bill filed in the superior court will demonstrate that it is an attempt to administer the assets of this bankrupt corporation. The corporation is alleged to be insolvent. Its indebtedness, not only to the complainant, who brings the bill, but to a number of other persons who are not made parties, is set out in extenso. Judgments against it are scheduled. Its indebtedness on open accounts is stated, as the act requires. As the act requires, it is alleged that the complainant demanded of the defendant payment of that portion of the indebtedness which has matured, and that the defendant has failed to pay. The bill also contains this pregnant allegation:

"Petitioner further submits to the court that in the present lamentable condition of the defendant's affairs the interposition of a court of equity

is absolutely demanded, both in the interest of the petitioners as well as of the defendant itself; that in order to avoid a multiplicity of costly suits at law, and to avoid the needless sacrifice of the defendant's property and of petitioner's security, a court of equity, through its receiver, could so administer and wind up the affairs of said company, converting its property and assets into cash at the earliest practicable date, as to realize for the defendant and its creditors the largest possible price and value for its various assets."

Among the prayers is one that a permanent receiver be appointed to take possession of the entire property and assets of every description whatsoever, to administer the same under the direction and orders of the court, and to convert the same into cash at some early day for prompt distribution among its various creditors according to their respective priorities. A further prayer is that "all the other creditors of the said defendant company be allowed to become parties to this proceeding, which plaintiff prays may be taken as a creditors' bill, for the purpose of protecting the rights of all parties at interest."

It is impossible, we think, to conceive of a bill more essentially a bankruptcy proceeding. It is true that there is no prayer that the defendant shall be granted his discharge by the chancellor of the state court, but the act quoted above empowers this. It is, however, said that this is not a bankruptcy proceeding, because there is but one complainant, and before the state court is authorized to take jurisdiction on a case of this character it requires three creditors to unite as parties plaintiff; that is to say, that, as the bill could have no standing in the state court under the statute, it should be given full force and effect here to defeat the jurisdiction of this court in bankruptcy. This contention seems to be based upon a misconception of the state insolvency law itself. It does not require that there should be three parties plaintiff, but that one-third of the indebtedness shall be represented by the complainants. Non constat but that this is true with the present bill.

It is further contended that the bill is framed under section 2770 of the Code, which provides for an ordinary foreclosure suit in equity, as authorized by the law and practice of courts, both state and federal. That section provides that "the holder of any mortgage on real or personal property, or both, shall be at liberty to foreclose such mortgage in equity according to the practice of courts of equity as well as by the methods prescribed in the Code." The latter clause refers to the statutory method for foreclosure. But the contention that this is an ordinary foreclosure in equity seems to be wholly contradicted by the averments and prayers of the proceeding in the superior court. Foreclosure in equity, under the section just quoted, does not require any allegation of insolvency on the part of the mortgagor, yet here it is alleged to be insolvent. It does not require an allegation that the amount due has been demanded, yet here the allegation of demand is carefully made. A mortgagee is only concerned with his own debt; here the debts of many other creditors are set out and described. To a proceeding to foreclose a mortgage, other creditors, and particularly general creditors, would be improper parties; here the bill prays that they may be

allowed to become parties. In foreclosure proceedings a mortgagee is concerned only with the specific property mortgaged; here the complainant in the state court, by apt averments and prayers, seeks to bring in, not only the mortgaged property, but all the other assets not covered by his mortgage. In a bill for foreclosure the mortgagee has no right to concern himself with the general administration of his debtor's estate, or with the general welfare of the debtor; here, with a solicitude almost paternal, the complainant deplores the lamentable condition of the bankrupt's affairs, and insists that the interposition of a court of equity is absolutely demanded, both in the interest of the defendant as well as of the plaintiff. In other words, every requisite of the state bankrupt act is set out with peculiar care in the proceeding in the superior court under consideration, and not one of the features pointed out is essential in a bill for ordinary foreclosure in equity, contemplated by section 2770 of the Code. Thus it appears that the proceeding in the state court conforms in every substantial respect to the requisites of the state insolvency or bankrupt legislation, and this court cannot shut its eyes to the general character of the proceeding, merely because it is declared to be an ordinary bill for foreclosure. The character of a proceeding in court is to be tested by what may be accomplished under it, and it cannot be denied that the superior court of the state under this pleading could administer the assets of the bankrupt corporation, and distribute them according to state laws, as to preferences, priorities, and the like, as effectually and completely as might be done by the bankruptcy courts in obedience to the national law intended to affect the same persons and the same subject-matter. The conclusion is inexorable that the bill described is a state insolvency proceeding, and the question to be determined is, will the courts of the United States permit its use to oust the jurisdiction of this court, and thus nullify the act now in operation, entitled "An act to establish an uniform system of bankruptcy throughout the United States"? If competent in this case, it is competent in all cases. A lienholder may, in the state court, be the creator of an independent bankruptcy system of his own. The result may be that the bankruptcy courts must sit idly by, and, despite the appeals of creditors, see the assets of bankrupts distributed under the state laws, where preferences to favored creditors are not only allowed, but encouraged, and practically every other purpose of congress, as expressed in the act of 1898, confounded and set at naught. What is of great concern to the creditors before the court is the fact that the respondent Carling is in possession of all the assets of the company now adjudicated bankrupt. They insist in their application that for the preservation of these values the marshal should take possession, and, from the application and the record, the court finds this to be true. It may be added that the duty of Carling to surrender this property, particularly that not covered by the mortgage, the books and accounts, and choses in action, is made imperative by the decision in Tinsley v. Anderson, 171 U. S. 101, 18 Sup. Ct. 805, 43 L. Ed. 91, and he is not entitled to discharge, even on habeas corpus, until this is done.

In the determination of this important question there are certain well-settled legal principles which must be considered. The first of these is fundamental, and is found in clause 2 of article 6 of the constitution of the United States. It provides: "This constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land, and the judges of every state shall be bound thereby, anything in the constitution or law of any state to the contrary notwithstanding." Clause 4, § 8, art. 1, of the constitution provides "that the congress shall have power to establish uniform laws on the subject of bankruptcies throughout the United States." It must be, as we have seen, a uniform law. It must be on the subject of bankruptcies throughout the United States. That uniformity must extend to each state, and it follows, therefore, that, if a state has enacted a bankruptcy law of its own, when congress acts, the state law must give way to the uniform national law. This is inevitable, because state laws may be and are multiform, and not uniform, and also because the law of congress which is made in pursuance of the constitution is the supreme law, when brought into contraposition to the law of the state. This supremacy is not inimical to the law of the state, for the clause of the constitution I have read is expressly adopted as the first paragraph of the first section of the Code of Georgia.

The proposition that the state bankrupt law is suspended by the enactment of the uniform system of national bankruptcy is as clear upon authority as it must inevitably be by the logic of the supremacy of national law.

In the case of Tua v. Carriere, 117 U. S. 201–210, 6 Sup. Ct. 565–570, 29 L. Ed. 855–859, this is clearly settled. The question arose under the laws and practice of Louisiana. Justice Woods for the court quotes with approval a decision from Louisiana, in the case of Orr v. Lisso, 33 La. Ann. 476, which declared that "the insolvent laws now in force in this state were in existence in 1867, when congress adopted a uniform system of bankruptcy"; and the court added: "The operation and effect of those laws were suspended until September 1, 1878, when the general bankruptcy law was repealed;" and the supreme court holds that the insolvency law of the state was inoperative while the bankruptcy act remained in force, but that with the repeal of the bankruptcy act all the provisions of the insolvent law of Louisiana became valid and operative.

In Manufacturing Co. v. Hamilton, a case decided in December, 1898, which I find printed in that valuable publication the American Bankruptcy Reports [volume 1, p. 39, (s. c. 51 N. E. 529)], the supreme court of Massachusetts, Judge Knowlton rendering the opinion, decided the question squarely. It is thus stated:

"The question in this case is whether this act so far superseded the insolvency laws of this commonwealth from the time of its passage as to deprive our courts of jurisdiction to entertain petitions for the commencement of insolvency proceedings filed after July 1, 1898."

After stating the unquestionable powers of congress, the court on page 40, 1 Am. Bankr. R., and page 530, 51 N. E., states that "the

language is materially different from that of the bankruptcy law of 1867." The learned judge remarks:

"The argument that the change in question was intentional is almost irresistible. The act is to go into full force and effect upon its passage; that is to say, the rights of all persons in the particulars to which the act refers are to be determined by the act from the time of its passage. Among these rights is the right to have insolvent estates settled in bankruptcy under the provisions of the act, including the rights to have the acts of bankruptcy affecting the settlement of estates determined by it (section 3), to have the rights of debtors to file voluntary petitions, and of creditors to file involuntary petitions, determined by it (section 4), and have preferences and liens governed by the provisions of it (sections 60, 67). These various provisions, affecting the rights and conduct of debtors and creditors, are different from those previously existing in most of the states, and perhaps different from those found in the laws of any state, and they supersede all conflicting provisions. The only saving clause [says the learned judge] affecting the jurisdiction of the state courts provides for cases commenced in those courts before the passage of the act."

As we have seen, the insolvency proceeding in this cause was filed long after that date. After stating that the proceedings commenced in the state court after the passage of the act are unauthorized, the court concludes:

"We are of opinion that the language was chosen to make clear the purpose of congress that the new system of bankruptcy should supersede all state laws in regard to insolvency from the date of the passage of the statute."

This case has the high authority arising from the unanimous opinion of that renowned court.

This is, however, no new doctrine. In Sturges v. Crowninshield, 4 Wheat. 122, 4 L. Ed. 529, decided in 1819, Chief Justice Marshall, while holding that the state had authority to establish bankrupt laws, declared:

"If in the opinion of congress uniform laws concerning bankrupts ought to be established, it does not follow that partial laws may not exist, or that state legislation on the subject must cease. It is not the mere existence of the power, but its exercise, which is incompatible with the exercise of the same power by the states. It is not the right to establish these uniform laws, but their actual establishment, which is inconsistent with the partial acts of the states."

It is true that in two cases (Ex parte Ziegenfuss [Sup. Ct. N. C.] 24 N. C. 463, and Reed v. Taylor, 32 Iowa, 209, 7 Am. Rep. 180) it was held that the insolvency laws continue to exist and to operate with full vigor until the bankruptcy law attaches upon the person and property of the bankrupt, and that until it is judicially ascertained that the petitioner is a person entitled to the benefit of the bankrupt law, by being adjudged a bankrupt by a decree of the court, he is subject to insolvency laws. These cases, if acceptable, would not be applicable here, because adjudication in bankruptcy is already had. The overwhelming weight of authority, however, is that, if suits are commenced under the provisions of state insolvency laws after the bankrupt act goes into operation, all of the proceedings in the state courts are null and void. Indeed, with regard to Ex parte Ziegenfuss, supra, Mr. Gould, the learned author of the notes to 2 Kent, Comm. (14th Ed.) 391, informs us that "this case has been overruled,

and I think very justly." In Griswold v. Pratt, 9 Metc. 16, it was adjudged:

"While the bankruptcy law of the United States is in force, it destroys the validity of the operation of the state insolvency law, even though no proceeding be had under it at the time. The one system supersedes the other, for they would in their proceedings be repugnant to each other."

This conclusion would seem scarcely open to controversy, in view of section 711 of the Revised Statutes, which provides in express terms that the jurisdiction of all matters and proceedings in bankruptcy in the courts of the United States shall be exclusive of the courts of the several states. It needs no elucidation to satisfy the mind that, if jurisdiction of a particular topic is exclusively intrusted to the national courts, no other courts have any jurisdiction with regard to it. A multitude of cases on this subject are collected and discussed in Manufacturing Co. v. Hamilton, note, on pages 41–44, 1 Am. Bankr. R. (s. c. 51 N. E. 529), and the proposition is sustained that, after the bankruptcy act takes effect, proceedings under insolvency laws of the state, so far as they relate to the same subject-matter and affect the same persons as the bankruptcy act, are ipso facto null and void. The recent rulings of the United States courts with entire unanimity sustain this proposition. In re Bruss-Ritter Co., 1 Am. Bankr. R. 58, 90 Fed. 651 (district court of Wisconsin, decided by Judge Seaman, December 10, 1898); In re Etheridge Furniture Co., 1 Am. Bankr. R. 112, 92 Fed. 329 (United States district court for district of Kentucky, decided by Judge Barr, February 14, 1899). There it was also held that where, under an insolvency act, the state court takes possession and is administering the property, if afterwards an involuntary petition in bankruptcy is filed against the assignor, based upon the assignment, the court of bankruptcy may and ought to appoint a receiver to take charge of the assigned property pending the filing of the petition and the appointment of a trustee in bankruptcy. In the case now under consideration the filing of these insolvency proceedings in the state court is alleged as an act of bankruptcy. In re McKee, 1 Am. Bankr. R. 311. The state court in Kentucky held that to the extent that state statutes dealt with any subject of bankruptcy covered by the national act it must give way, and that to whatever extent congress has provided a remedy or prescribed procedure its authority is paramount. The district court of the Southern district of Illinois, in Re Curtis, 1 Am. Bankr. R. 440, 91 Fed. 737, held that a law which was in legal effect a general insolvency law of Illinois is superseded by the bankruptcy act of 1898, and that proceedings commenced under it are void and null, not merely voidable. There, as here, an insolvency act had been construed by the state supreme court. There, as here, the supreme court of the state had held that it was essentially, in its framework and detail, a general insolvent law, and that a new special jurisdiction had been conferred, through the instrumentality of which an insolvent debtor may make an entirely equitable distribution of his effects among his creditors. There, as here, the United States court held that this construction of the state law was binding. The court concludes: "After the 1st day of July, 1898, the proceedings in state

courts under state insolvency laws are, as against proceedings under the national bankruptcy act, coram non judice. Such proceedings have no validity, no more than have proceedings in a state court, when once a cause has been properly removed therefrom into the federal court." Steamship Co. v. Tugman, 106 U. S. 118, 1 Sup. Ct. 58, 27 L. Ed. 87, and Crehore v. Railway Co., 131 U. S. 241, 9 Sup. Ct. 692, 33 L. Ed. 144. To understand the strength of this analogy, in Crehore's Case it was held that, after a case was removed, the state court is thereafter without jurisdiction, that its rightful jurisdiction comes to an end, and that it has absolutely ceased, and the jurisdiction of the United States court immediately attached. And in the case of Steamship Co. v. Tugman not only are the same principles also announced, but it is declared that, after the jurisdiction of the United States court has attached, it could not be restored to the state court by consent of the parties. See In re Richards, 2 Am. Bankr. R. 506, 94 Fed. 633; In re Wright, 2 Am. Bankr. R. 592, 95 Fed. 807, decision by Judge Lowell.

It is, moreover, true that the decisions of the supreme court of Georgia are not in any manner in conflict with these authorities. In the case of Dodd v. Hammock, 59 Ga. 403, Chief Justice Jackson for the court has expressly declared:

"Whatever may have been the concurrent jurisdiction of the state court with the courts of the United States in such cases prior to the adoption of the Revised Statutes of the United States, section 711 thereafter vested the exclusive jurisdiction in the courts of the United States."

And in Dodd v. Middleton, 63 Ga. 635, that learned judge declared for the court:

"I am of the opinion that when the estate of the bankrupt is administered one court should administer it. The framers of the American constitution seemed to have had unity of administration in view when congress was invested with power to pass uniform laws on the subject of bankruptcy. Unless uniformly administered, that uniform enactment becomes almost necessarily multiform."

The views of American text writers of the highest repute, and at varying periods of the history of our jurisprudence, are strictly in consonance with the judicial precedents. Chancellor Kent, on page 390 of the first volume of his great Commentaries, which cover the entire field of American jurisprudence, while stating the right of a state to enact insolvency laws, declares: "There must be no act of congress in existence on the subject conflicting with such law."

In the recent treatise on American Law by that well-known writer James Dewitt Andrews, published in 1900, on page 396, in the discussion of this topic under the bankruptcy law now in force, it is stated that all proceedings under the state insolvency laws were superseded by the passage of the United States bankruptcy act. The author cites In re Rouse, Hazard & Co., 33 C. C. A. 356, 91 Fed. 96, and other authorities.

In the well-known and valuable work of Coll. Bankr. (3d Ed.), published in 1900, on pages 41 and 42, it is stated that "proceedings under state insolvency laws since the passage of the general bankruptcy act are void, whether or not bankruptcy proceedings follow."

An assignment is an act of bankruptcy, but it is merely voidable. Insolvency proceedings are absolutely void. Coll. Bankr. (3d Ed.) 477, 478.

From these considerations the conclusion seems irresistible that the appointment of the respondent Carling as receiver under the insolvency proceedings in the state court, these having been commenced while the present bankruptcy law was operative, is null and void, and may be so held in any court when it becomes material to the interest of the parties to consider it. Code Ga. § 5369.

It is, however, insisted with great earnestness that the doctrine of comity between the courts of the state and of the United States forbids us, through the marshal, to take possession and administer the assets of this bankrupt company, although they are, as plainly seen, held without warrant of state law, and in violation of the orders of this court. It can be justly claimed that no court has been more constant in its efforts to preserve that comity which is so salutary to the public when concurrent jurisdiction between its courts exists. Many cases might be cited, but Tefft v. Sternberg, 40 Fed. 2, 5 L. R. A. 221, will suffice. Here, however, we have seen, not only that there is no concurrent or co-ordinate jurisdiction, but that the jurisdiction of the bankruptcy court is exclusive; that the state law is suspended; and therefore that the state court has no jurisdiction at all. With much deference to the honorable the superior court of Bibb county, we are yet constrained to hold that comity cannot confer jurisdiction, and its exercise cannot impart validity to orders and decrees which are in themselves null and void. Besides, it appears from the order of the distinguished and learned judge presiding in the state court, set out in the response, that he has directed his receiver to appear before this court, and make answer here why he should not be required to turn over the property.

Upon an attentive consideration of the argument of respondent's counsel, it seems easy to distinguish every case cited from the principle and authorities which lead to the conclusion that the state court is without jurisdiction, and that the bankrupt court must take possession and administer the assets of the bankrupt company.

In Mayer v. Hellman, 91 U. S. 502, 23 L. Ed. 401, Justice Field, for the court, declared the statute of Ohio is not an "insolvent law," in any proper sense of the term. He continues:

"There is nothing in the act resembling an insolvent law. There was an insolvent law in the state, but the assignment in question was not made in pursuance of any of its provisions."

In McKenna v. Simpson, 129 U. S. 506, 9 Sup. Ct. 365, 32 L. Ed. 77, the assignee in bankruptcy sought the state court, and having chosen his forum, and having lost his case, the supreme court held that the jurisdiction of the state court was complete, and it could see no federal question to justify its interposition.

In Moran v. Sturges, 154 U. S. 256, 14 Sup. Ct. 1019, 38 L. Ed. 981, where there was a seizure by the state court of certain tug boats, while the supreme court announced that it is a rule of general application that where property is in the actual possession of one court, with competent jurisdiction, such possession cannot be disturbed by pro-

cess out of another court, yet, it being an admiralty case, the court, relying on section 711 of the Revised Statutes, held that the state court had no jurisdiction, and that its judgment was an unlawful interference with the jurisdiction of the district court. There, too, the exclusive jurisdiction in admiralty was exerted to nullify a state proceeding in insolvency.

In the case of Shields v. Coleman, 157 U. S. 168, 15 Sup. Ct. 570, 39 L. Ed. 660, the simple question was, as stated by Justice Brewer, "that of the jurisdiction of the federal court to appoint a receiver and take railroad property out of the possession of a receiver appointed by the state court." There, however, the receiver of the state court was duly appointed. The jurisdiction of the state court was recognized as concurrent jurisdiction, and there the state court first took possession.

The cases under the bankruptcy act of 1898, which were cited by counsel for respondent, are easily distinguishable from that at bar. In most of these there was a trustee applying to the bankruptcy court for relief, and, under the doctrine announced in Bardes v. Bank, 178 U. S. 524, 20 Sup. Ct. 1000, 44 L. Ed. 1175, relief could not be granted. In Re Price (D. C.) 92 Fed. 987, the receiver in the state court was appointed October 6, 1896, on dissolution of partnership, nearly two years before the bankruptcy law was enacted. In Re Holloway (D. C.) 93 Fed. 638, the suit in the state court commenced in 1897, and went to judgment long before the passage of the bankruptcy act. There, too, the trustee applied to the bankrupt court for an order for delivery of property held under foreclosure of mortgage. The mortgage was not questioned, and the amount exceeded the value of the property. In Ex parte Sharp (D. C.) 95 Fed. 635, a trustee applied to the bankruptcy court to compel a sheriff to deliver assets held under an attachment. Refusal was justified upon the principle decided in Bardes v. Bank, supra. In Re Klein (D. C.) 97 Fed. 31, a permanent trustee had been appointed, and his application was of course refused, although the proceeding in the state court was enjoined until he could sue there. In Re Gerdes (D. C.) 102 Fed. 318, there was a petition by a trustee addressed to the referee to enjoin the foreclosure of a mortgage in the state court. This was dismissed because not properly filed, and did not make a case entitling the trustee to the relief sought. In Frazier v. Trust Co., 40 C. C. A. 76, 99 Fed. 707, and Trust Co. v. Benbow, 96 Fed. 514, the insolvency proceedings had been begun in the state court, and a receiver appointed thereunder four years before the passage of the bankruptcy act. In Re Kavanaugh (D. C.) 99 Fed. 928, the state court had acquired jurisdiction before the bankruptcy act was passed, and the adjudication was not based upon any of the transfers assailed. In re Lesser (D. C.) 100 Fed. 433, was an application by the trustee to the bankruptcy court to stay a suit or creditors' bill against an insolvent debtor in the state court wherein the suit had been commenced and the receiver had been appointed in 1896. In re Porter (D. C.) 109 Fed. 111, was an application by a trustee for relief from mortgage foreclosure in the state court, on specific property worth less than the debt. The court held that it had the right to interfere,

but, in the exercise of its discretion, declined to do so. In Heath v. Shaffer (D. C.) 93 Fed. 647, the trustee applied to the bankruptcy court, after he had been made a party in the state court, for relief concerning the foreclosure of a mortgage on specific property. He had chosen his forum. And in Re Kersten, 110 Fed. 929, the question before the court was whether Kersten should be adjudged bankrupt, and the dicta as to what course the trustee should pursue were not in any manner in issue, and must be regarded as obiter.

Very strong reliance is placed by counsel for the respondent on the language of the circuit court of appeals of the Fifth circuit, in Re Seebold, 45 C. C. A. 117, 105 Fed. 910. It is true that with his accustomed vigor and clearness Judge McCormick in that case remarked:

"There is no provision in the present bankruptcy law which authorizes or permits courts of bankruptcy, by the use of either summary or plenary process, to stop proceedings of a state court in a suit in which it had already, before the institution of the proceeding in bankruptcy, obtained possession of the subject-matter and jurisdiction of the parties."

There, however, the court was held to be of competent original jurisdiction. There, too, the property, subject to the privilege and right of pledge, was in the hands of an officer of the state court. Judgment had been rendered, execution issued, property seized and advertised for sale, before the institution of proceedings in bankruptcy. These were voluntary proceedings instituted on the part of the bankrupt, and were doubtless intended to defeat the apparently meritorious demand which had been adjudicated, and finally concluded, in the state court.

The bankruptcy here is involuntary, and the proceeding in the state court, whatever may be said, is not merely to enforce a particular debt, but is designed to wind up the estate of the bankrupt, with power in that court to grant him a discharge. This is all competent to be done if the proceeding in the state court is not suspended. In other words, it is, as decided by the supreme court of Georgia, a state bankruptcy case, which is here adroitly used by the plaintiff therein to defeat entirely in this case the force and effect of the national bankruptcy law, and the rightful jurisdiction of the bankruptcy court of the United States.

For the reasons stated, we are constrained to conclude that the answer which the receiver, who is a party defendant to the bill now before the court, has been directed to make to this court, by the honorable the superior court of Bibb county, is wholly insufficient in law, that the orders and decrees under which he has acted are null and void, and that his possession of the assets of the bankrupt is without authority.

An order will be granted and enforced requiring him to account for and surrender these assets to the marshal.